**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Wavve Americas Incorporated, | No. CV-23-01819-PHX-MTL |
| Plaintiff, | **AMENDED ORDER** |
| v. | |
| Tumi Max, | |
| Defendant. | |

Plaintiff Wavve Americas, Inc. ("wA") moves for Default Judgment against Defendant Tumi Max, pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure. (Doc. 24.) For the following reasons, the Court grants the Motion (*id.*), including wA's request for a permanent injunction and its request that the Court order a transfer of ownership of the domain names <KOKOA.TV> and <KOKOATV.NET> to wA.[1]

## I.    BACKGROUND

wA is a Delaware corporation, with its principal place of business in Los Angeles, California. (Doc. 13 ¶ 7.) Additionally, wA is the lawful owner of United States Trademark Registration No. 6,183,377 for the mark KOCOWA and United States Trademark Registration No. 5,985,094 for the mark KOCOWA and design mark (the KOCOWA Logo). (*Id.* ¶¶ 18, 19.) It also owns and maintains the domain <KOCOWA.COM>. (*Id.* ¶ 20.)

wA distributes, or streams, over 1,300 Korean-produced television programs and

---

[1] Kevin Garcia, a second-year law student at the Sandra Day O'Connor College of Law at Arizona State University, assisted in drafting this Order.

files to viewers via its KOCOWA service, which caters to non-native English speakers. (*Id.* ¶¶ 8, 11–14.) Users can access the content for free with advertisements or pay a recurring subscription fee to stream the content without advertisements. (*Id.* ¶ 15.) KOCOWA is derived from the phrase "**KO**rean **CO**ntent **Wa**ve." (*Id.* ¶ 16.) KOCOWA has no separate meaning in English or Korean. (*Id.*)

Max is the registrant of <KOKOATV.NET>, <KOKOA.TV> (this website redirects users to <KOKOATV.NET>), and <VIDGROUND.COM>. (*Id.* ¶ 8.) Max's identity was revealed by Namecheap, Inc., which is an Arizona-based domain registrar. (*Id.* ¶¶ 3, 8.) Namecheap requires registrants "to consent to personal jurisdiction in this Court for disputes between Namecheap registrants . . . and third parties." (*Id.* ¶ 4.)

<KOKOATV.NET> offers access to Korean-based shows exclusively licensed to wA. (*Id.* ¶ 22.) But users are not able to access the content directly through <KOKOATV.NET>. (*Id.* ¶¶ 36–37.) Rather, <KOKOATV.NET> functions as an access point for content originating from a different website. (*Id.*) When a user arrives at <KOKOATV.NET> the user may click a "direct view" link to access a particular episode of a television program. (*Id.* ¶ 29.) The link will then direct the user to one of several different domains. (*Id.* ¶¶ 32–34.) Once the user arrives at the new domain, the user is then able to stream the desired content. (*Id.*) wA alleges that all content originates from <HQPLUSVIDGROUND>COM> regardless of which domain the user is directed to. (*Id.* ¶ 37.) Critically, if a user attempts to visit a domain without going through one of the "direct view" links on <KOKOATV.NET>, they will be directed to an entirely different webpage that does not contain content from <HQPLUSVIDGROUND.COM>. (*Id.* ¶¶ 35–36.) Thus, it is only by using the direct links on <KOKOATV.NET> that users are able to view the infringing content. (*Id.* ¶ 36.)

On September 13, 2023, wA filed its Amended Complaint against Max. (Doc. 13.) wA alleges claims of federal trademark infringement under 15 U.S.C. § 1114, cybersquatting under 15 U.S.C. § 1125 (d), copyright infringement under 17 U.S.C. § 501, federal unfair competition under 15 U.S.C. § 1125(a), and tortious interference with

business expectancy under Arizona common law. (*Id.* ¶ 1.) Max failed to file an answer or otherwise respond to the Amended Complaint. Accordingly, wA applied for entry of default on October 16, 2023. (Doc. 22.) The Clerk of the Court entered default on October 17, 2023. (Doc. 23.) wA then filed a Motion for Entry of Default Judgment on November 8, 2023. (Doc. 24.) Because the Clerk of the Court entered default, the Court takes the Amended Complaint's factual allegations as true. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." (citations omitted)).

## II.   LEGAL STANDARD

Once a default is entered, the district court has discretion to grant default judgment. *See* Fed. R. Civ. P. 55(b)(2); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980); *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986) (explaining that Rule 55 of the Federal Rules of Civil Procedure requires a two-step process: an entry of default judgment must be preceded by an entry of default). The following factors are to be considered when deciding whether default judgment is appropriate:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of the plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring a decision on the merits.

*Eitel*, 782 F.2d at 1471–72.

Because wA is the party seeking default judgment, "it bears the burden of demonstrating to the Court that the complaint is sufficient on its face and that the *Eitel* factors weigh in favor of granting default judgment." *Norris v. Shenzhen IVPS Tech. Co.*, No. CV-20-01212-PHX-DWL, 2021 WL 4844116, at *2 (D. Ariz. Oct. 18, 2021).

## III.   JURISDICTION, VENUE, AND SERVICE

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over

both the subject matter and the parties." *Tuli v. Republic of Iraq*, 172 F.3d 707, 712 (9th Cir. 1999). And "[i]n the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). If a plaintiff's proof is limited to written materials, only these materials need to demonstrate sufficient facts that support a finding of jurisdiction. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (citation omitted).

### A.   Personal Jurisdiction

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Arizona's long-arm statute conforms with the requirements of federal due process. Ariz. R. Civ. P. 4.2(a). Therefore, the analysis of personal jurisdiction under Arizona law is the same. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004).

For the exercise of personal jurisdiction to comport with federal due process, Max must have certain "minimum contacts" with Arizona such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* at 801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Supreme Court has recognized two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 255 (2017). A court has general personal jurisdiction, e.g., jurisdiction over "any and all claims," when a defendant is "essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co*, 326 U.S. at 317). Often, defendants are subject to general personal jurisdiction in the state of their domicile. *Bristol-Myers Squibb Co.*, 582 U.S. at 255. Whether the Court may exercise general jurisdiction over Max is not at issue here.

Specific personal jurisdiction—limited to a narrower class of claims than general personal jurisdiction—exists when the defendant has taken "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Specific personal jurisdiction may also be

established by party consent, such as through a forum selection clause. *See Mallory v. Norfolk S. Ry.*, 600 U.S. 122, 145 (2023). Such clauses are presumptively valid. *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009) (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)). And "forum selection clauses are to be specifically enforced unless the party opposing the clause clearly shows that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Manetti-Farrow, Inc v. Gucci Am., Inc.*, 858 F.2d 509, 512 (9th Cir. 1988) (cleaned up).

Max's address is listed in Thailand. (Doc. 13 ¶ 10.) But wA alleges that Max expressly consented to the Court's jurisdiction when he agreed to the Namecheap Registration Agreement, which requires:

> [F]or the adjudication of third party disputes (i.e., disputes between you and another party, not us) concerning or arising from use of domain names registered hereunder, **you should submit without object, without prejudice to other potentially applicable jurisdictions, to the subject matter and personal jurisdiction of the courts** . . . (ii) where we are located, currently those **State or federal courts whose geographic districts include Maricopa County, State of Arizona.**

(Doc. 13-3 at 23) (emphasis added).

Here, Max's acceptance of Namecheap's Registration Agreement establishes consent to personal jurisdiction. Because the Ninth Circuit has recognized that a forum selection clause alone is sufficient to confer personal jurisdiction, the Court finds it may exercise specific personal jurisdiction over Max. *See S.E.C. v. Ross*, 504 F.3d 1130, 1149 (9th Cir. 2007).

## B.    Subject Matter Jurisdiction

The Court has original subject matter jurisdiction over any civil action that arises under any act of Congress relating to patents, copyrights, and trademarks. 28 U.S.C. §§ 1331, 1338; *Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296, 1300 (C.D. Cal. 1996). wA alleges a variety of federal claims: trademark infringement under 15 U.S.C. § 1114, cybersquatting under 15 U.S.C. § 1125(d), copyright infringement under 17 U.S.C. § 501, and unfair competition under 15 U.S.C. § 1125. (Doc. 13 ¶ 1.)

1    Accordingly, the Court has subject matter jurisdiction over those claims.

2        Additionally, under 28 U.S.C. § 1367(a), a federal court shall have supplemental

3    jurisdiction over all state-law claims that are within the same common nucleus of operative

4    facts as the claim with original jurisdiction. *Bahrampour v. Lampert*, 356 F.3d 969, 978

5    (2004). Because the state-law claim arises from the same common nucleus of operative

6    facts that gave rise to the trademark infringement claims under the Lanham Act, the Court

7    will exercise supplemental jurisdiction over the Arizona common law tortious interference

8    with business expectancy claim. (*Id*.)

9        **C.    Venue**

10        Pursuant to 28 U.S.C. § 1391(b)(2) venue is proper in "a judicial district in which a

11    substantial part of the events or omissions giving rise to the claim occurred." "In a

12    trademark suit brought under the Lanham Act, a 'substantial part' of the events giving rise

13    to the claims occur in any district where consumers are likely to be confused by the accused

14    goods." *Golden Scorpio Corp. v. Steel Horse Bar & Grill*, 596 F. Supp. 2d 1282, 1286 (D.

15    Ariz. 2009) (citations omitted). Max's websites are accessible to and likely to cause

16    confusion among consumers within this District. Therefore, venue is proper.

17        **D.    Service of Process**

18        Federal Rule of Civil Procedure 4(f)(3) permits the Court to authorize service on an

19    individual in a foreign country "by other means not prohibited by international agreement,

20    as the court orders." Fed. R. Civ. P. 4(f)(3); *see Rio Props., Inc. v. Rio Int'l Interlink*, 284

21    F.3d 1007, 1014 (9th Cir. 2002). The Court previously found that alternative service was

22    warranted in this case pursuant to Rule 4(f)(3). (Doc. 18.) In compliance with that Order,

23    wA properly served Max via his email address on September 26, 2023, with Summons and

24    the Complaint (Doc. 21); on November 14, 2023, with the Motion for Entry of Default

25    (Doc. 26); and on November 15, 2023, with the Motion for Default (Doc. 27).

26    **IV.    DEFAULT JUDGMENT**

27        **A.    The First, Fifth, Sixth, and Seventh *Eitel* Factors**

28        In cases like this, in which the defendant has not responded, nor participated in any

litigation, the "first, fifth, sixth, and seventh [*Eitel*] factors are easily addressed." *Zekelman Indus. v. Marker*, No. CV-19-02109-PHX-DWL, 2020 WL 1495210, at *3 (D. Ariz. March 27, 2020).

The first factor weighs in favor of default judgment because denying wA's Motion will leave it "without other recourse for recovery." *Pepsico, Inc. v. Cal. Sec. Cans*, 238 F.Supp. 2d 1172, 1177 (C.D. Cal. 2002). Prejudice would result if wA's Motion was denied because it would lose the right to a "judicial resolution" of its claims. *See generally Elektra Ent. Grp. v. Crawford*, 226 F.R.D. 388, 392 (C.D. Cal. 2022) (citing *Eitel*, 782 F.2d at 1471–72). Due to Max's failure to cease distributing the infringing content, and its failure to respond to wA's Amended Complaint, the only appropriate recourse wA has is through litigation and this Motion. (Doc. 24 at 8.)

The fifth factor weighs in favor of default judgment because the well-pleaded factual allegations in the Amended Complaint are taken as true, and there is no "genuine dispute of material facts" that would preclude granting the Motion. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177.

The sixth factor weighs in favor of default judgment because Max was properly served. (Docs. 21, 26, 27.) Further, it is unlikely that Max's failure to answer was due to excusable neglect. The Namecheap Registration Agreement warns the registrant that:

> [I]t is important for you [the registrant] to regularly monitor email sent to the email address associated with your account and domain names because . . . if a dispute arises regarding Services provided to you, you may lose rights to receive the Service if you do not respond expeditiously to an email sent in conjunction therewith.

(Doc. 13-3 at 9.) Thus, Max was appraised that he may receive important communications at the email address at which he was served.

The seventh factor, which favors a decision on the merits, generally weighs against default judgment; however, Rule 55 of the Federal Rules of Civil Procedure "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (cleaned up). This factor is not sufficient to preclude the entry of default judgment in this

case. *Warner Bros. Ent., Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1073 (C.D. Cal. 2004). Max has had notice of this lawsuit since September 22, 2023, and had ample time to answer or respond. (Doc. 21.) Max chose not to participate.

**B.    The Second and Third *Eitel* Factors**

The second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint—are often "analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Viet. Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (citing *PepsiCo*, 238 F. Supp. 2d at 1175). The Court addresses wA's claims under 15 U.S.C. § 1114 for federal trademark infringement; 15 U.S.C. § 1125(d) for cybersquatting; 17 U.S.C. § 501 for copyright infringement; 15 U.S.C. § 1125(a) for federal unfair competition; and tortious interference with business expectancy under Arizona common law. (Doc. 13 ¶¶ 71–116.)

**1.    Federal trademark infringement and federal unfair competition claims**

Claims for federal trademark infringement under 15 U.S.C. § 1114 and federal unfair competition under 15 U.S.C. § 1125(a) are subject to the same legal standards. *Mintz v. Subaru of Am., Inc.*, 715 Fed. Appx. 618, 622 (noting that the elements needed to establish federal unfair competition are identical to the elements needed to establish trademark infringement); *see also Brookfield Commc'ns, Inc. v. West Coast Ent. Grp.*, 174 F.3d 1036, 1067 n.8 (9th Cir. 1999).

To prevail on the trademark infringement and unfair competition claims under the Lanham Act, wA must show that it has ownership of a valid mark and that Max's distribution of the infringing content "is likely to cause confusion, or to cause mistake, or to deceive." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 935 (9th Cir. 2015) (quoting *Fortune Dynamic, Inc v. Victoria's Secret Sores Brand Mgmt.*, 618 F.3d 1025, 1030 (9th Cir. 2010)). "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d

1127, 1129 (9th Cir. 1998). Further, "the confusion must be probable, not simply a possibility." *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996) (cleaned up).

The Court must first analyze whether wA has a valid, protectable trademark interest in the infringing content Max is distributing. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1046–47. wA's registration of the marks on the Principal Register in the Patent and Trademark Office "constitutes prima facie evidence of the validity of the registered mark and of [wA's] exclusive right to use the mark on the goods and service specified in the registration." (Doc. 13 ¶¶ 18–19); *Brookfield Commc'ns, Inc.*, 174 F.3d at 1047 (citing 15 U.S.C. §§ 1057(b);1115(a)). Max has not produced rebuttal evidence showing that it is entitled to distribute the infringing content.

Next, to determine the likelihood of confusion to the "reasonably prudent consumer in the marketplace," the Court considers eight factors:  "(1) [s]trength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) types of goods and purchaser care; (7) intent; and (8) likelihood of expansion." *Dreamwerks Prod. Grp.*, 142 F.3d at 1129.

### i.      Strength of the mark

When analyzing the first factor, courts examine the mark's conceptual strength and commercial strength. *Network Automation, Inc. v. Adv. Sys. Concepts*, 638 F.3d 1137, 1149 (9th Cir. 2011). Conceptual strength classifies the mark "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary or fanciful." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058. And "commercial strength is based on actual marketplace recognition." *Network Automation, Inc.*, 638 F.3d at 1149 (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058) (internal quotations omitted).

On the conceptual prong, arbitrary marks are considered "strong marks, entitled to a greater degree of protection than common or weak marks." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993) (internal citations and quotations omitted). wA's "KOCOWA mark is an arbitrary backcronym of '**KO**rea **CO**ntent **Wa**ve." (Doc. 13 ¶ 16.)

1
2
3

This mark uses portions of "common words in a fictitious and arbitrary manner to create a distinctive mark which identifies the source of the product." *Dreamwerks Prod. Grp.*, 142 F.3d at 1130 n.7; *see also Official Airline Guides, Inc.*, 6 F.3d at 1390.

4
5
6
7
8
9
10
11
12
13
14
15

In addition to marketplace recognition, commercial strength may be established by "significant investment of resources to advertise the mark." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 758 (9th Cir. 2018). wA purports to be "a leading entertainment company and distributor of Korean-originating media content in the Americas" serving "a growing demand for Korean-produced programming in the United States." (Doc. 13 ¶¶ 11–12.) But additional information is needed to sufficiently establish marketplace recognition. For instance, wA did not indicate its number of registered users. Additionally, wA did not allege that it has spent considerable resources advertising its KOCOWA mark but rather acknowledged that it "relies heavily on word-of-mouth . . . to increase its registered user (and subscriber base)." (*Id.* ¶ 17.) Thus, while KOCOWA is a conceptually strong mark, the Court cannot conclude, at least far as demonstrated by the Amended Complaint, that it is a commercially strong mark.

16
17
18
19
20
21
22
23
24
25
26
27

In evaluating the strength of a mark, the commercial and conceptual prongs must be considered jointly. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:80 (5th ed. 2023). Yet when domain names are "nearly identical" and "the products involved are closely related . . . . the strength of the mark is of diminished importance in the likelihood of confusion analysis." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1058–59. Here, "wA owns and maintains the domain name KOCOWA.COM" and "[Max] owns, operates, and maintains" the phonetically and visually similar domain names <KOKOATV.NET> and <KOKOA.TV>. (Doc. 13 ¶¶ 20–21.) Both wA and Max distribute Korean-originating programing. (*Id.* 13. ¶¶ 11, 23.) Indeed, the uncontested facts demonstrate that Max distributes the very same programming available through wA's service. (*Id.* 13 ¶¶ 25–27.) Thus, the first factor weighs slightly against wA but is not dispositive.

28

### ii.     Proximity or relatedness of the goods

The second factor examines the relatedness of the two products. "The proximity of goods is measured by whether the products are (1): complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation, Inc.*, 638 F.3d at 1150 (citation omitted). Both wA and Max distribute Korean television content. (*Id.* 13 ¶ 44; Doc. 13-33.) And both wA and Max distribute this content to consumers interested in Korean television. (*Id.*). Because these products are marketed and sold to the same intended consumer target market, there is a likelihood that consumers will be confused. (*Id.*); *see Dreamweks Prod. Grp.*, 142 F.3d at 1130. Thus, this factor weighs for wA.

### iii.     Similarity of sight

The third factor weighs the similarity of the marks, which is tested based on sight, sound, and meaning. *Network Automation Inc.*, 638 at 1150 (citing *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 351 (9th Cir. 1979)). "The greater the similarity of the defendant's mark to the plaintiff's mark, the greater the likelihood of confusion." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Max's domains <KOKOATV.NET> and <KOKOA.TV> are very similar to wA's <KOCOWA.COM> domain. These domains sound similar and are spelled similarly. (Doc. 13 ¶¶ 8, 20, 44; Doc. 13-33.) Because both wA and Max target the same non-English-speaking users, the phonetic similarity between the domain names may be confusing. (*Id.* ¶¶17, 43–48). The potential for confusion is redoubled by the fact that wA relies on word-of-mouth promotion of its services. (*Id.* 13 ¶ 17.); *See Sleekcraft Boats*, 599 F.2d at 351–52) (noting that sound is important because reputation is often conveyed by word-of-mouth). Accordingly, this factor suggests a likelihood of confusion.

### iv.     Evidence of actual confusion

The fourth factor considers evidence of actual confusion. "The failure to *prove* instances of actual confusion is not dispositive against a trademark plaintiff, because actual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its

absence generally unnoteworthy." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1050 (citation omitted) (emphasis in original). Although wA did not provide evidence of actual confusion between its domain and Max's domains, this does not weigh against wA.

### v.    Marketing channels

The fifth factor analyzes "whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014) (citing *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir.1987)). wA and Max distribute Korean-produced programming via a common marketing channel—the internet. (Doc. 13 ¶¶ 12, 22.) Moreover, because wA and Max offer content directed at individuals interested in Korean-produced programming, wA and Max draw from the same general class of consumers. (*Id.* ¶¶ 11, 23.) Thus, the fifth factor weighs in favor of wA.

### vi.    Types of goods and purchaser care

The sixth factor examines "the type of good or service offered and the degree of care one would expect from the average buyer exercising ordinary caution." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 877 (9th Cir. 2014). Consumers searching for expensive products online are expected to be more sophisticated. *Network Automation Inc.*, 638 F.3d at 1153 (citation omitted). Conversely, consumers typically exercise little care in the selection of inexpensive items that may be purchased on impulse. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983). The content offered by wA and Max is not expensive and may be accessed at a whim. Consequently, a consumer seeking to access content provided by wA or Max would not be expected to exercise a great degree of care. A laxer degree of care, in concert with the similarities between wA and Max's domain names, results in a reasonable likelihood of consumer confusion. The sixth factor weighs for wA.

### vii.    Intent

The seventh factor weighs the alleged infringer's intent. "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant

can accomplish his purpose: that is, the public will be deceived." *Network Automation Inc.*, 638 F.3d at 1153 (citation omitted). A defendant's knowledge that he adopted a mark confusingly similar to another's mark may be actual or constructive. *Brookfield Commc'ns, Inc.*, 174 F.3d at 1059 (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157 (9th Cir. 1963)). Moreover, when a defendant profits from the public's confusion, it is some evidence of intent to deceive. *See Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028–29 (9th Cir. 2004) (finding that a defendant collecting revenue from users clicking potentially misleading ads demonstrated intent to deceive the public). Here, there is no direct evidence that Max knowingly adopted <KOKOATV.NET> and <KOKOA.TV> with intent to deceive the public. On the other hand, wA alleges that Max derived advertising revenue from users visiting <KOKOATV.NET> (Doc. 13. ¶¶ 23, 56.) Given the similarities to wA's KOCOWA mark, at least some of the visits to <KOKOATV.NET> may have been the result of consumer confusion as opposed to legitimate consumer interest, but Max stood to profit in either case. *See Playboy Enterprises, Inc. v. Netscape Commc'ns Corp.*, 354 F.3d at 1029. Thus, despite a lack of evidence demonstrating Max's actual knowledge, wA made factual allegations, which the Court must take as true, sufficient to infer that Max knowingly adopted a mark like wA's mark. This factor weighs slightly in favor of wA.

### viii. Likelihood of expansion

The eighth and final factor considers the likelihood of expansion. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354 (citing Restatement of Torts § 731(b) & Comment c). And "when goods are closely related, any expansion is likely to result in direct competition." *Id*. Therefore, because wA and Max are directly competing for consumers seeking Korean-produced television, the potential that one or both of the parties will enter the other's submarket is strong. *Id*. This final factor also suggests a strong likelihood of confusion.

1    Five factors of the "reasonably prudent consumer test" favor wA, including:

2    proximity or relatedness of the products, similarity, convergence of marketing channels,

3    the types of goods and purchase care, and the likelihood of expansion. Accordingly, wA

4    has sufficiently stated claims of federal trademark infringement and federal unfair

5    competition. Since wA's allegations are to be taken as true, it has therefore stated claims

6    for federal trademark and unfair competition on which it may recover. *Geddes*,

7    559 F.2d at 560.

8                          **2.    Cybersquatting Claim**

9            For claims for cybersquatting under the Anticybersquatting Consumer Protection

10   Act, wA must prove that "(1) the defendant registered, trafficked in, or used a domain

11   name; (2) the domain name is identical or confusingly similar to a protected mark owned

12   by the plaintiff; and (3) the defendant acted with bad faith intent to profit from that mark."

13   *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010).

14          First, wA demonstrated that Max registered the domain names <KOKOA.TV> and

15   <KOKOATV.NET>. (Doc. 13-37 at 2–3.) Second, Max's <KOKOA.TV> and

16   <KOKOATV.NET> domains are visually similar and nearly phonetically identical. (Doc.

17   13 ¶¶ 20, 21.) The alteration in spelling and the addition of "TV" to Max's domain names

18   are "slight differences" from wA's KOCOWA mark and therefore are "irrelevant." *ICON*

19   *Health & Fitness Inc. v. pro-form.com*, No. CV-15-01981-PHX-BSB, 2017 WL 4797794,

20   at *6 (D. Ariz. Sept. 12, 2017) (citing *DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 206

21   (6th Cir. 2004)). Thus, <KOKOA.TV> and <KOKOATV.NET> domains are confusingly

22   similar to <KOCOWA.COM>.

23          Third, Max acted with bad faith intent to profit from KOKA.TV and

24   KOKOATV.NET. There are "nine nonexclusive factors for courts to consider in

25   determining whether bad faith exists." *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th

26   Cir. 2009). But the court does not need to "march through the nine factors" because the use

27   of these factors is permissive. *Id.* (citation omitted). Here, factors five and eight are most

28   informative:

- 14 -

1

2

3

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain . . . by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

4

. . . .

5

6

7

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names . . .

8   Federal Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(B)(I)

9   Max uses <KOKOA.TV> and <KOKOATV.NET> to stream infringing copies of

10  works to which wA has the exclusive rights. For example, wA has the exclusive right to

11  stream and distribute a Korean television show called "Numbers" through its website

12  <KOCOWA.COM>. (Doc. 13 ¶¶ 20, 26; Doc. 13-3 at 2.) Max also provides streaming

13  access to "Numbers" via <KOKOA.TV>. (Doc. 13-4 at 2.) This is just one example of how

14  Max diverts customers from wA's online streaming service. Although Max does not charge

15  money for users to access its streaming services (Doc. 13 ¶ 22), Max derives revenue from

16  the advertisements on <KOKOA.TV> and <KOKOATV.NET> (Id. ¶¶ 23, 56).

17  Additionally, Max acquired multiple domain names that are confusingly similar to wA's

18  mark. Thus, Max's use of <KOKOA.TV> and <KOKOATV.NET> demonstrate Max's

19  bad faith intent to profit by intentionally diverting customers away from wA's legitimate

20  KOCOWA service. See Cosmetic Alchemy, LLC v. R&G, LLC, No.

21  CV-10-1222-PHX-GMS, 2010 WL 4777553, at *6–7 (D. Ariz. Nov. 17, 2020) (finding

22  bad faith where the counter-defendant intended to profit from a domain name by diverting

23  customers and distributors away from the original website). Finally, Max employs an

24  elaborate system of redirecting viewers through multiple websites to obscure the true

25  source of the infringing content. (Doc. 13 ¶¶ 34–37.) Accordingly, wA has sufficiently

26  stated a claim for cybersquatting.

27  ### 3.    Copyright Infringement Claim

28  Before reaching the merits of the copyright claim, the Court considers whether the

copyrighted works must be registered with the U.S. Copyright Office, whether wA has standing to bring the copyright claim, and whether United States copyright law is applicable. Then, the Court examines the merits of wA's copyright infringement claim under 17 U.S.C. § 501. (Doc. 13 ¶ 86.)

### i.     Preliminary Matters

### a.     Registration of Copyrighted Works

United States works must be registered with the U.S. Copyright Office before a civil action for infringement of a copyright may commence. 17 U.S.C. § 411(a). But there is an exception for foreigners who are subject to the Berne Convention, which allows "foreigners who have not registered to sue for copyright infringements occurring after March 1, 1989" to bring copyright claims in the United States. *Health Tech. Investors v. Itamar Med.*, No. CV-06-1229-PHX-SRB, 2007 WL 9724273, at *9 (D. Ariz. May 29, 2007). A plaintiff who alleges a show is first broadcast and publicly displayed in another country sufficiently demonstrates the show is not published in the United States. *Crunchyroll, Inc. v. Pledge*, No. C 11-2334 SBA, 2014 WL 1347492, at *16 (N.D. Cal. Mar. 31, 2014).

Korea is a signatory of the Berne Convention. (Doc. 13 ¶ 86.) Moreover, wA alleges that each of the copyrighted works are displayed in Korea before they are distributed in the United States (Doc. 13 ¶ 13.) Thus, the copyrighted works at issue do not need to be registered in the United States for wA to bring this claim.

### b.     Standing

"The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). These "exclusive rights may be chopped up and owned separately, and each separate owner of a subdivided exclusive right may sue to enforce that owned portion of an exclusive right, no matter how small." *Silvers v. Sony Pictutures Ent., Inc.*, 402 F.3d 881, 887 (9th Cir. 2005).

Here, wA allege that KBS, SBS, and MCB (the three largest Korean broadcast

networks), exclusively granted wA the business rights for over-the-top media service to distribute content. (Doc. 24-4; Doc. 24-6; Doc. 24-8.) Because wA has exclusive business rights to distribute over-the-top media content, wA has standing to bring this copyright claim against Max.

### c.    Application of United States Copyright Law

"[F]or U.S. copyright law to apply, at least one alleged infringement must be completed entirely within the United States, and . . . mere authorization of extraterritorial infringement [is] not a completed act of infringement in the United States." *Allarmcom Pay TV, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995). For example, transmissions that originate in the United States but are broadcasted to a different country are not subject to United States copyright law; these infringing acts are not completed until the signal reaches a different country. *Id.* Here, the broadcast originates in Korea, but is transmitted into the United States. Max copied content from wA and made that content available for consumers in the United States. (Doc. 13 ¶ 22.) Once consumers in the United States had access to the infringing content, the infringing act was completed. Thus, U.S. copyright law is applicable because the action of streaming the infringed content in the United States is not "wholly extraterritorial." *Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1146 (N.D. Cal. 2011).

### ii.    Merits of the Copyright Claim

A prima facie case of copyright infringement under 17 U.S.C. § 501 requires wA to "demonstrate ownership of the copyright at issue, a violation of an exclusive right set forth in copyright, and causation by the defendant." *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1080 (9th Cir. 2021) (citation omitted). First, wA demonstrated ownership of the copyright at issue through the Content Supply Agreements between it and KBS, SBS, and MCB. (Doc. 24-4; Doc. 24-6; Doc. 24-8.) Second, Max violated wA's exclusive rights to the copyrighted material when he distributed unauthorized copies of the works to viewers in the United States. (Doc. 13 ¶¶ 87, 88.) Third, Max caused the violation because he "acted volitionally" when he uploaded and transmitted the copyrighted material to

<KOKOA.TV>, <KOKOATV.NET>, and <VIDGROUND.COM>. (*Id.* ¶¶ 25, 38.) wA has sufficiently stated a claim for copyright infringement.

### 4. Tortious Interference Claim

To prevail under its common law tortious interference with business practices claim, wA must establish: "(1) existence of a valid contractual relationship or business expectancy; (2) interferer's knowledge of that relationship or expectancy; (3) intentional interference inducing termination of that relationship or expectancy; and (4) resultant damages." *Alpha Phoenix Indus. LLC v. SCInternational Inc.*, No. CV-12-1848-PHX-SMM, 2013 WL 5814850, at *3 (D. Ariz. Oct. 29, 2013).

wA is in the business of distributing copyrighted programming to viewers. (Doc. 13 ¶ 13–14.) Necessarily, wA maintains contractual and prospective business relationships with customers, broadcast networks, and other individuals. (*Id.* ¶¶ 99–100). Even absent knowledge of any of wA's specific contractual relationships, such as with a particular broadcaster or customer, knowledge that wA seeks to "continually attempt to negotiate" with others is sufficient knowledge of business expectancy. *Edwards v. Anaconda Co.*, 115 Ariz. 313, 315, 565 P.2d 190, 192 (Ct. App. 1977). The nature of wA's business is such that wA seeks to retain existing viewers and attract new viewers. By offering free access to the same programs licensed to wA, Max demonstrates knowledge of a pool of viewers targeted by wA for continuous negotiation. Moreover, through the same actions, Max demonstrates intent to interfere with actual or potential business relationships with those viewers. wA sustained damages including "losses in profits and revenues, loss of existing and potential sales, contractors, agents, and employees, loss of business relationships with existing and future customers, employees, agents, and independent contractors, and loss of competitive advantage, goodwill, opportunity, and/or expectancy." (Doc. 13 ¶ 105.)

Thus, wA has stated a claim for tortious interference with business practices.

### C. The Fourth *Eitel* Factor

Under the fourth *Eitel* factor, the Court considers the amount of money at stake in relation to the seriousness of the defendant's conduct. *See PepsiCo, Inc.*, 238 F. Supp. 2d

at 1177. "If the sum of money at stake is completely disproportionate or inappropriate, default judgment is disfavored." *Century Fox Film Corp. v. Streeter,* 438 F. Supp. 2d 1065, 1071 (D. Ariz. 2006). In contrast to a complaint's other allegations, allegations pertaining to damages are not taken as true when considering a motion for default judgment. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002) (citations omitted). A district court has "wide latitude" in determining the amount of damages to award upon default judgment. *James v. Frame*, 6 F.3d 307, 310 (9th Cir. 1993).

wA does not seek monetary damages. Rather, it seeks injunctive relief from Max's reproduction, distribution, or public display of the copyrighted works. (Doc. 1 ¶¶ 46, 50.) Accordingly, this factor favors granting default judgment.

### D.    Relief Sought—Permanent Injunction and Transfer of Domain Names

wA requests a permanent injunction against Max's reproduction, distribution, and public display of the copyrighted works. (Doc. 24 at 24.) The Lanham Act empowers the Court to "grant injunctions according to the rules of equity and upon such terms as the court may deem reasonable, to prevent the violation of a mark holder's rights." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177 (citing 15 U.S.C. § 1116(a)) (internal citations omitted). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). wA must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Id.*

The Lanham Act adds a statutory layer to the irreparable harm analysis for trademark infringement, which creates a "rebuttable presumption of irreparable harm when a permanent injunction is sought to remedy an established trademark violation." *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F. 4th 995, 1005 (9th Cir. 2023) (citing 15 U.S.C. § 1116(a))

- 19 -

1    (original quotations omitted); *see also AK Futures LLC v. Boyd St. Distro, LLC*, 35 F. 4th

2    682, 694 (9th Cir. 2022). Thus, there is a rebuttable presumption of irreparable harm here.

3        Further, the Court finds that Max's continued actions would cause wA irreparable

4    injury that cannot be fully compensated by any monetary damages. The balance of

5    hardships also favors wA (i.e., source, origin, or approval of goods associated with wA's

6    KOCOWA mark and service, or devaluation of wA's goodwill and business reputation).

7    (Doc. 13 ¶¶ 74, 82.) And the public interest is not disserved by prohibiting wA from

8    engaging in conduct contrary to law. *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 Fed.

9    Appx. 633, 636 (9th Cir. 2013) ("An injunction that prevents consumer confusion in

10   trademark cases . . . serves the public interest.").

11       Additionally, "[i]n any civil action involving the registration, trafficking, or use of

12   a domain name under this paragraph, a court may order . . . the transfer of the domain name

13   to the owner of the mark." 15 U.S.C. 1125(d)(1)(C). But "only upon proving the rigorous

14   elements of cybersquatting under the [Anticybersquatting Consumer Protection Act (15

15   U.S.C. § 1125(d))] have plaintiffs successfully forced the transfer of an infringing domain

16   name." *Interstellar Starships Servs. v. Epix Inc.*, 304 F.3d 936, 948 (9th Cir. 2002). And

17   "even in egregious cases of cybersquatting . . . the district court retains discretion to fashion

18   appropriate relief, and it need not force the transfer of the offending domain name." *Id.* wA

19   has sufficiently met its substantial burden of establishing its cybersquatting claim. In this

20   instance, transfer of Max's offending domain names is warranted.

21       **E.    Attorney's Fees**

22       wA also seeks an award of its reasonable attorney's fees. (Doc. 13 at 33.) The Ninth

23   Circuit has upheld awards of attorneys' fees arising under the Lanham Act in the default

24   judgment context "solely because, by entry of default judgment, the district court

25   determined, as alleged in [plaintiff's] complaint, that [defendant's] acts were committed

26   knowingly, maliciously, and oppressively with an intent to . . . injure [plaintiff]." *Derek*

27   *Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2020). Max's infringement

28   is willful because it continued to infringe wA's trademark after it was served two months

ago. (Docs. 21, 26, 27); *Trident Inv. Partners v. Evans*, No. CV-20-01848-PHX, 2021 WL 75826, at *8 (Ariz. Dist. Jan. 8, 2021). And by defaulting, Max has indirectly admitted it has committed willful infringement. *Derek Andrew, Inc.*, 528 F.3d at 702 (noting that the defendant's default sufficiently established the plaintiff's entitlement to attorney's fees under the Lanham Act). Therefore, Max's willful infringement and its failure to participate in the litigation entitle wA to reasonable attorney's fees under the Lanham Act.

**V.     CONCLUSION**

Accordingly,

**IT IS ORDERED** that Plaintiff Wavve Americas, Inc. Motion for Default Judgment Against Defendant Tumi Max (Doc. 24) is **granted**.

**IT IS FURTHER ORDERED** that the Court will enter permanent injunction by separate order.

**IT IS FINALLY ORDERED** that Plaintiff Wavve Americas, Inc. shall have thirty days from the date of this Order to file a motion for attorneys' fees and costs that complies in all respects with LRCiv 54.2.

Dated this 6th day of February, 2024.

Michael T. Liburdi
United States District Judge